UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**MELVIN RICHARD ROBINSON III,**

**Plaintiff,**

**v.**

**AARON PILGRAM, *et al*.,**

**Defendants.**

Civil Action No. 20-cv-2965 (GMH)

## MEMORANDUM OPINION

This case boils down to whether the Court should fashion a remedy for alleged constitutional violations where Congress has failed to enact one and the application of such a remedy could have national security implications. The short answer is, "No."

Melvin Richard Robinson III ("Plaintiff"), who proceeds *pro se*, brings this putative *Bivens* action against two Secret Service officers, Aaron Pilgrim[1] and Paul Naples ("Defendants") for alleged deprivations of his constitutional rights arising from his arrest in Washington, D.C. on June 5, 2020. The arrest resulted from law enforcement's discovery that Plaintiff's vehicle, parked a short distance from the White House, contained a high capacity magazine, a 10mm bullet, and brass knuckles.[2] In rambling and often confusing filings, Plaintiff appears to assert that Defendants violated his rights under the First, Second, Fourth, Fifth, Tenth, and Fourteenth Amendments to the U.S. Constitution. Defendants moved to dismiss Plaintiff's claims on various grounds, including that Plaintiff's pleadings fail to state a claim for relief; that Plaintiff's claims are barred

---

[1] "Pilgrim" appears to be the proper spelling of this defendant's last name, and that spelling will be used throughout the opinion.

[2] Plaintiff faces criminal charges in Washington, D.C. for possession of the high-capacity magazine. *See U.S. v. Robinson*, Case No. 2020 CF2 005181 (D.C. Sup. Ct. 2020).

by the doctrine of sovereign immunity; that no *Bivens* claims can be maintained against the Defendants; and that Defendants are entitled to qualified immunity. In response to the Defendants' motion to dismiss, Plaintiff appeared to raise yet more claims: that his Eighth and Ninth Amendment rights were violated, too. Although Plaintiff's allegations are far from a model of clarity—and, indeed, contain a number of irrelevant statements and *ad hominem* attacks on Defendants' counsel—the Court has given them the most liberal reading possible. Even so, the Court finds it lacks subject matter jurisdiction over Plaintiff's official capacity claims against Defendants and that a *Bivens* remedy should not be extended to his individual capacity claims, which, in any event, are barred by qualified immunity. The Court therefore grants Defendants' motion to dismiss.[3]

## I.      BACKGROUND

### A.      Procedural Background

In this case, it is helpful to first recount the procedural background before discussing the factual allegations in the operative complaint and the Defendants' motion to dismiss.

Plaintiff first brought suit against the Defendants on October 6, 2020 (the "Initial Complaint"). *See* ECF No. 1. The Initial Complaint, which was filed using a fillable "Complaint For Violation of Civil Rights" form, indicated that Plaintiff was bringing a *Bivens* claim for violations of his Second, Fourth, Fifth, and Tenth Amendment rights. *See id.* at 3. In response to the form's question "What are the facts underlying your claim(s)?," Plaintiff's entire response was that he was "[a]rrest[ed] by the Secret Service behind white house – the local agencies should have camera evidence." *Id.* at 4. In response to the form's question concerning his injuries, Plaintiff

---

[3] The relevant docket entries for the purposes of this motion are Defendants' Motion to Dismiss (ECF No. 21-1); Plaintiff's Response to Defendant's Motion to Dismiss (ECF No. 23); and Defendants' Reply to the Opposition to the Motion to Dismiss (ECF No. 24). The page numbers cited herein are those assigned by the Court's CM/ECF system.

wrote the following:  "Reputation has been damaged, pain caused because of injuries.  Emotional distress.  I was put in a position of discomfort by being handcuffed behind my back with a spine injury."  *Id.* at 5.  In the "Relief Sought" section, Plaintiff wrote the following:

TRO/Preliminary Injunction Relief.

20 million dollars.

A. Magazine Ammo limitations

B. 10mm Ammo Restrictions

C. Brass knuckles Ban

E. 2nd Amendment travel Restrictions

I'm asking for a TRO/Preliminary Injunction on these four unconstitutional laws by state and local officials.

∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

A. TRO/Injunction to return my electronics

B. TRO/Injunction to handcuff me in the Front Due to injury

C. TRO/Injunction to drop all unconstitutional charges

I'm asking for money for injuries to my reputation and my life will never be the same.

*Id.*  Plaintiff also asked that he be appointed an attorney "under Civil Rights laws."  *Id.*

The Court noted that the First Complaint was "deficient in several respects," including that it failed to "allege the specific actions taken by the defendants that violated [Plaintiff's] civil rights"; the doctrine of sovereign immunity barred Plaintiff's claims for monetary relief; and it "lack[ed] sufficient detail" in support of his requests for injunctive relief.  ECF No. 3 at 2.

Plaintiff was ordered to amend his complaint within 30 days to cure these issues.  *See id.* at 3.  Specifically, Plaintiff was told that his amended complaint had to "identify[ ] the claims he

intends to bring, against whom, and in what capacity." *Id.*  On November 9, 2020, Plaintiff filed

an amended complaint, which is now the operative pleading (the "Amended Complaint").  *See*

ECF No. 4.  In granting Plaintiff's motion to amend his complaint, the Court explained that, while

the claims "still are not a model of clarity," they were "sufficiently colorable" to proceed.  ECF

No. 6 at 2.  However, the Court did dismiss Plaintiff's claims for equitable relief, all of which were

styled as requests for a "TRO/Preliminary Injunction."[4]  *See id.* at 2–3.  Plaintiff's request for

appointment of counsel was also denied.  *See id.* at 3.  Thus, at this stage, only Plaintiff's putative

*Bivens* claims against Defendants remain.[5]  The Court now turns to the substance of those claims.

### B.    Factual Allegations and the Motion to Dismiss

Plaintiff's Amended Complaint is labeled as a "Memorandum" and comes in the form of

several pages of typed text (not the form complaint previously filed).  *See generally* ECF No. 4.

He alleges that he was in the District of Columbia "working as a freelance photo journalist" on

June 5, 2020, during the "George Floyd Protest." *Id.* at 1–2.  In the evening, when Plaintiff arrived

back at his vehicle that was "parked behind the White House," he claims that "the Secret Service"

arrested him. *Id.* at 1.  According to Plaintiff, "[m]any of the officers" were not wearing "proper

---

[4] Plaintiff's claims for preliminary injunctive relief were as follows:  as to the First Amendment, Plaintiff sought "a TRO/Preliminary injunction on my restraining order from the White House," though it is not clear the "restraining order" to which he refers.  ECF No. 4 at 4.  As to the Second Amendment, Plaintiff sought a "TRO/Preliminary Injunction on laws banning High capacity magazines, Ammo restrictions and laws banning brass knuckles." *Id.*  As to the Fourth Amendment, Plaintiff had two requests, the first to return his phones, i-Pad, and camera, and the second "for all law [enforcement] to handcuff me in the front due to my injuries if I'm compliant." *Id* at 4–5.  As to the Fifth Amendment, Plaintiff sought a "TRO/Preliminary Injunction on all local and state government officials from making unconstitutional 2nd Amendment laws restricting my right to travel with a self-defense Tool" and "[a] nationwide TRO/Preliminary injunction on all high -capacity magazine, ammo and brass knuckles restricting laws." *Id.* at 5.  Last, concerning the Tenth Amendment, Plaintiff demanded that "all Government officials/Law enforcement to wear a mask in Covid-19 hot spots across the country." *Id.*  The Court dismissed these claims because Plaintiff failed to "allege[ ] any facts to support his request for preliminary injunctive relief" and did not "demonstrate[ ] that such extraordinary relief is warranted in this circumstance."  ECF No. 6 at 2–3.  Plaintiff then "appealed" the dismissal of his injunctive relief claims, *see* ECF No. 9, which the Court denied in a minute order.  *See* Minute Order (Jan. 28, 2021) (finding that "Plaintiff has failed to demonstrate a likelihood of success or irreparable harm with respect to his preliminary injunction motion").

[5] To be clear, none of Plaintiff's claims for equitable relief survive because the only equitable relief sought was the multiple preliminary injunction requests that the Court denied.

face coverings" and therefore "increased [his] exposure to Covid-19." *Id.* at 1–2. On this point, Plaintiff cryptically cites the "10th Amendment (Jacobson vs Mass)." *Id.* at 1–2. Later, Plaintiff describes his Tenth Amendment claim as "Public Health Risk." *Id.* at 4.

Plaintiff then says the agents searched his vehicle and seized his "cell phones, I-pad and camera," intrusions he claims were "without cause or due process" and therefore violated the Fourth and Fifth Amendments. *Id.* at 2. He acknowledges that, during the search of his vehicle, the agents found "a high capacity magazine, one 10mm bullet, and Brass Knuckles." *Id.* The former two items, Plaintiff says, were purchased legally in North Carolina. *See id.* In any event, Plaintiff asserts, he has a "5th Amendment right to travel with a self-defense tool," which he claims was violated during the arrest. *Id.* Later, Plaintiff makes another Fourth Amendment claim, this time for excessive force. *See id.* at 3. Plaintiff explains that, due to a 2018 car accident, he has "a spinal injury with concussive syndrome." *Id.* As a result, he says, he "cannot be handcuffed behind the back." *Id.* The Amended Complaint suggests that Plaintiff was, however, handcuffed behind the back despite his "peaceful and compliant" behavior and his multiple requests to "move [his] hand posit[i]on." *Id.*

He next pivots to a First Amendment claim. Because he was in Washington as a "freelance photo journalist," Plaintiff says his arrest "violated the 1st Amendment freedom of the press, when [he] was taking pictures of the protest." *Id.* at 2–3. He then alleges that his "1st Amendment rights of freedom to assemble" were infringed because he "was walking on the side walk in protest to all the destruction" and "was protesting the riots in support of local law enforcement and was encouraging people to protest peacefully." *Id.* at 3. Thus, Plaintiff claims, "[t]he Secret Service violated the 1st Amendment twice by arresting [him] during a peaceful protest supporting the police, while working as a photo journalist." *Id.* at 3.

Plaintiff then returns to the weapons found in his vehicle and claims that, by arresting him for possession of the magazine, bullet, and brass knuckles, "they" (referring to "the Secret Service") violated his Second, Fifth, and Fourteenth Amendment rights. *See id.* at 3. Notably, Plaintiff never mentions agents Pilgrim or Naples in his factual allegations and fails to explain their roles in the alleged constitutional violations. Nor did Plaintiff adhere to the Court's directive to specify whether he was bringing claims against Defendants in their individual or official capacities.

As to money damages, Plaintiff says that if compensatory damages are cognizable, he seeks "20 million dollars for multiple constitutional violations." *Id.* at 5. In apparent reference to the criminal case pending against him, Plaintiff alleges that his reputation and employment prospects will be impaired "in the future as a felon. *See id.* at 5. He also claims that financial compensation would "help with [his] pain and suffering" resulting from being handcuffed behind his back. *Id.* at 5–6.

Thus, liberally construed, the Amended Complaint asserts violations of Plaintiff's First, Second, Fourth, Fifth, Tenth, and Fourteenth Amendment rights and seeks $20 million in damages.

Defendants moved to dismiss Plaintiff's claims on a number of grounds. *See generally* ECF No. 21-1. *First*, Defendants assert that the Plaintiff has not alleged sufficient factual material to support his claims, pointing particularly to his failure to "allege specific actions taken by the Defendants that violated his constitutional rights." *Id.* at 11–12. *Second*, Plaintiff's Fourteenth Amendment claim is not cognizable, Defendants argue, because that provision of the Constitution is only applicable to the States, and Defendants are federal agents. *See id*. at 12. *Third*, Defendants assert that even if Plaintiff had pleaded his claims adequately, they would nevertheless be barred by the doctrine of sovereign immunity, at least as to any official capacity claims he brings. *See id.*

at 12–14.  *Fourth*, as to the individual capacity (i.e., *Bivens*) claims, Defendants argue those fail at

the threshold because they are not factually supported.  *See id.* at 14–15.  *Fifth*, Defendants contend

that even if the *Bivens* claims were properly asserted, claims under *Bivens* are highly circumscribed

and should not be expanded into the new frontiers from which Plaintiff beckons.  *See id.* at 15–22.

*Finally*, to the extent Plaintiff does have a *Bivens* remedy, Defendants say they are entitled to

qualified immunity.  *See id.* at 22–24.

In his opposition to Defendants' motion, Plaintiff eschewed any substantive response and

instead sought to add more facts and claims to an already-lengthy list of charges.[6]  *See generally*

ECF No. 23.  While these new claims, like the first set, are difficult to make out, it appears that

Plaintiff has added a Ninth Amendment claim stemming from his allegation that, during the arrest,

the federal agents "took [his] marijuana" and/or "took a couple of Vape carts, marijuana jelly, and

a leafy substance."  *Id.* at 1.  For these allegedly unlawful deprivations, Plaintiff seeks over $50,000

and demands that "all federal agents stop arresting citizens for marijuana violations when states

have [made its possession] legal."  *Id.* at 1–2.  Without any substantive analysis or argument,

Plaintiff avers that the Court should extend *Bivens* to cover Ninth Amendment claims "because

federal agents are arresting [individuals for the possession of] legal marijuana in states where the

people voted on it for recreational or medical use."  *Id.* at 2.  The response also seems to add an

Eighth Amendment claim, which Plaintiff suggests stems from the agents handcuffing him behind

his back.  *See id.* at 4.  Elsewhere in his response, Plaintiff asserts that he is a member of the North

Carolina militia and has a Second and Fifth Amendment right to travel as a militia member.  *See*

---

[6] Although "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded," *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) *aff'd sub nom. Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, United Methodist Church*, 98 F. App'x 8 (D.C. Cir. 2004), the Court will duly consider all of Defendants' arguments for dismissal in light of Plaintiff's *pro se* status..

*id.* at 2.  He also attempts to clarify his Tenth Amendment claim, which he says arises from the agents' failures to "Follow The Mask mandates" when arresting him.  *Id.* at 5.

## II.  LEGAL STANDARDS

### A.  Motions to Dismiss Under Rule 12(b)(1)

A motion under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the court's [subject-matter] jurisdiction" over the case before it.  *Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)); Fed. R. Civ. P. 12(b)(1).  When deciding these motions, courts must accept as true the factual allegations in the complaint and construe all reasonable inferences in the light most favorable to the plaintiff.  *See Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019).  A court need not, however, "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)); *see also Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (noting that, in assessing Rule 12(b)(1) motions, the court does "not assume the truth of legal conclusions").  Where its power to hear a case is at issue, a court will subject a plaintiff's complaint to "closer scrutiny" than on a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *See, e.g., Walsh v. Comey*, 118 F. Supp. 3d 22, 25 (D.D.C. 2015).  Thus, unlike a Rule 12(b)(6) motion, a court ruling on a Rule 12(b)(1) motion may consider evidence beyond the four corners of the complaint and material subject to judicial notice. *See Gustave–Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C. 2002); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).   Indeed, where a party mounts a factual challenge—that is, it attacks the "underlying facts contained in the complaint" rather than merely the allegations included on the face of the complaint—the court "*must* weigh the allegations of the

complaint and evidence outside the pleadings in order to 'satisfy itself as to the existence of its power to hear the case.'" *Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156, 162 (D.D.C. 2003) (emphasis added) (quoting *Loughlin v. United States*, 230 F. Supp. 2d 26, 35 (D.D.C. 2002)).  Ultimately, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

### B.      Motions to Dismiss Under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6). "[A] Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 123 (D.D.C. 2016).  Although a court must assume the veracity of the complaint's factual allegations and construe them in the light most favorable to the plaintiff, a court need not accept conclusory assertions or legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  And while detailed factual allegations are not required at the pleading stage, a complaint must offer more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Iqbal*, 556 U.S. at 678 (citations omitted).  Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  To meet this standard, the plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7]  *Id.*

Where, as here, a complaint is brought by a *pro se* party, the court should construe the *pro se* plaintiff's pleadings liberally in determining whether to dismiss a complaint for failure

---

[7] Plaintiff is no doubt well aware of these pleading standards, having filed numerous *pro se* complaints in other federal courts and seen them dismissed for pleading infirmities.  *See, e.g.*, *Robinson v. Pardee UNC Healthcare*, No. 1:20-

to state a claim upon which relief can be granted.  *Taylor v. District of Columbia*, 606 F. Supp. 2d 93, 95 (D.D.C. 2009).  Indeed, "where a *pro se* party has filed multiple submissions, the district court must generally consider those filings together and as a whole."  *Williams v. Shinseki*, 161 F. Supp. 3d 77, 84 (D.D.C. 2011); *see also Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) ("[A] district court errs in failing to consider a *pro se* litigant's complaint in light of all filings, including filings responsive to a motion to dismiss.").  However, while complaints filed by *pro se* parties "must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), they still "must present a claim on which the [c]ourt can grant relief."  *Belton v. Shinseki*, 637 F. Supp. 2d 20, 23 (D.D.C. 2009) (quoting *Chandler v. Roche*, 215 F. Supp. 2d 166, 168 (D.D.C. 2002)); *see also Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987) (noting that the leeway afforded *pro se* parties is not "a license . . . to ignore the Federal Rules of Civil Procedure or expect the Court to decide what claims a plaintiff may or may not want to assert").  In addition, "courts are not responsible for hunting through the record in search of material potentially helpful to a [*pro se*] party's case," because "asking the Court to comb through attachments to discern the substance of the plaintiff's claims risks placing it more in the role of advocate than judge."  *Nichols v. Vilsack*, No. 13-1502, 2015 WL 9581799, at *1 (D.D.C. Dec. 30, 2015).

## III.    DISCUSSION

Given the most liberal reading possible, Plaintiff's pleadings assert that, in arresting him and confiscating the contraband and other items found on his person and in his vehicle, "the Secret

---

CV-372, 2021 WL 456633, at *2 (W.D.N.C. Jan. 11, 2021) (dismissing Plaintiff's claims under the Americans with Disabilities Act for failure to state a claim), *appeal dismissed and remanded*, 846 F. App'x 211 (4th Cir. 2021); *Robinson v. Brickton Vill. Ass'n, Inc.*, No. 1:20 CV 30, 2020 WL 7865723, at *4 (W.D.N.C. Sept. 25, 2020) (recommending that Plaintiff's claims under the Fair Housing Act be dismissed for failure to state a claim), *report and recommendation adopted*, 2020 WL 7865279 (W.D.N.C. Dec. 30, 2020).

Service" violated his First, Second, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendment rights.[8]  For these alleged deprivations, Plaintiff seeks tens of millions of dollars in monetary damages.

Viewing his pleadings as a whole, Plaintiff's claims against the two Secret Service agents fairly appear to be made pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  In *Bivens*, the Supreme Court recognized an implied right of action for damages against federal officials for violations of an individual's Fourth Amendment rights.  A *Bivens* cause of action has since been extended to gender discrimination claims made under to the Fifth Amendment and cruel and unusual punishment claims made under the Eighth Amendment.  *See Davis v. Passman*, 442 U.S. 228 (1979) (expanding *Bivens* to Fifth Amendment gender discrimination claims); *Carlson v. Green*, 446 U.S. 14 (1980) expanding *Bivens* to Eighth Amendment cruel and unusual punishment claims).  However, *Bivens* has been extended no further, and the "expansion of *Bivens* is 'a "disfavored" judicial activity.'"[9]  *Hernandez v. Mesa*, __ U.S. __, __, 140 S. Ct. 735, 742 (2020) (quoting *Ziglar v. Abbasi*, 582 U.S. __, __, 137 S. Ct. 1843, 1857 (2017)).

Defendants' threshold argument for dismissal of the *Bivens* claims is that Plaintiff has not pleaded sufficient factual material to support them.  *See* ECF No. 21 at 11–12.  They are correct.

---

[8] Plaintiff's Eighth and Ninth Amendment claims appear for the first time in his response to Defendants' motion to dismiss.  *See* ECF No. 23 at 1–2, 4.  In other scenarios, these claims would not be considered.  *See Doe v. Lee*, No. 19-CV-0085, 2020 WL 759177, at *8 n.4 (D.D.C. Feb. 14, 2020) ("[A] court cannot consider claims first raised in an opposition brief when deciding a motion to dismiss.").  However, given Plaintiff's *pro se* status, the Court will assess the Eighth and Ninth Amendment claims as if properly raised.

[9] Indeed, the *Bivens* doctrine rests on what appears to be increasingly shaky ground.  At least two current Supreme Court Justices favor doing away with it altogether, while a total of five "have gone so far as to observe that if 'the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that we would have reached the same result." *Hernandez*, __ U.S. at __, 140 S. Ct. at 742–43 (quoting *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1856); *see also id.* at 752 (Thomas, J., concurring, joined by Gorsuch, J.) ("[I]t appears that we have already repudiated the foundation of the *Bivens* doctrine; nothing is left to do but overrule it.").

In particular, Plaintiff utterly fails to allege that agents Pilgrim and Naples themselves took any action that violated his constitutional rights. *See generally* ECF Nos. 4 and 23. Plaintiff repeatedly points to the "officers," "agents," and "Secret Service" as the culprits, but he never—not once—explains the roles of these Defendants. *Id.* "Even though a court must construe the pleadings of a pro se plaintiff liberally in a civil rights case, a plaintiff must still allege facts with some specificity as to the actions taken by each defendant to violate his rights." *Jones v. United States*, No. CV 11-2242, 2019 WL 1301788, at *11 (C.D. Cal. Feb. 25, 2019), *report and recommendation adopted*, No. CV 11-2242, 2019 WL 1298971 (C.D. Cal. Mar. 21, 2019), *appeal dismissed sub nom. Jones v. Woodring*, No. 19-55623, 2019 WL 6337446 (9th Cir. Sept. 13, 2019). Thus, the court in *Jones* dismissed the plaintiff's *Bivens* claim for "fail[ing] to allege any act by any particular defendant." *Id.* The same result obtains here, where Plaintiff did not attribute any conduct to officers Naples or Pilgrim with any "specificity." Indeed, it is difficult to see Plaintiff's claims as anything more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" proscribed by *Iqbal*, 556 U.S. at 678, when the sum total of the facts alleged are that Plaintiff was in Washington as a "freelance photo journalist" when he was arrested (his electronics and marijuana products confiscated in the process) and handcuffed behind his back—exacerbating a preexisting injury—and was discovered to have a high capacity magazine, a 10mm bullet, and brass knuckles in his possession. *See generally* ECF Nos. 4 and 23. However, even taking the facts that are pleaded as sufficient, they do not entitle Plaintiff to relief for the other reasons set forth by Defendants.

As noted above, despite the Court's instructions, the Amended Complaint does not specify whether Plaintiff is suing Defendants in their official and/or individual (personal) capacities. *See generally* ECF No. 4. "Personal-capacity suits seek to impose personal liability upon a

government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Suits against an officer in their official capacity, on the other hand, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [government] entity." *Graham*, 473 U.S. at 166.  Consistent with the leeway *pro se* parties must be afforded, the Court will construe the Amended Complaint as bringing both official and individual capacity claims.  The Court addresses these claims in turn.[10]

Before doing so, however, the Court can quickly dispose of Plaintiff's claims under the Eighth, Ninth, Tenth, and Fourteenth Amendments, all of which are facially invalid.

---

[10] The Court notes briefly that Plaintiff's claims, despite proceeding alongside parallel criminal proceedings in the District of Columbia, *see U.S. v. Robinson*, Case No. 2020 CF2 005181 (D.C. Sup. Ct. 2020), are not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  *Heck* held that "a criminal defendant may not recover damages under 42 U.S.C. § 1983 for 'harm caused by actions whose unlawfulness would render [his] conviction or sentence invalid' unless 'the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'"  *Williams v. Hill*, 74 F.3d 1339, 1339 (D.C. Cir. 1996) (per curiam) (alteration in original) (quoting *Heck*, 512 U.S. at 486–87).  The D.C. Circuit has held that the rationale of *Heck* extends to *Bivens* claims.  *See id.* at 1339–41 ("The rationale of *Heck* applies equally to claims against federal officials in *Bivens* actions.").  However, because *Heck* "has no application to an anticipated future conviction," it does not operate to bar Plaintiff's *Bivens* claims given that his criminal prosecution remains ongoing.  *Stegemann v. Rensselaer Cty. Sheriff's Off.*, 648 F. App'x 73, 76 (2d Cir. 2016) (holding that a plaintiff's *Bivens* claims could not be dismissed under *Heck* because the plaintiff's "criminal trial is still ongoing"); *see also, e.g.*, *Cohen v. Rosenstein*, 610 F. App'x 240, 241 (4th Cir. 2015) (per curiam) (reversing the district court's dismissal of the plaintiff's *Bivens* claims against federal prosecutors "[b]ecause no conviction has yet occurred," and therefore "the district court's dismissal under *Heck* is premature").

Likewise, and although neither party addressed the issue, the Court does not believe a stay of these proceedings is necessary to maintain the integrity of Plaintiff's criminal case, as the Supreme Court in *Wallace v. Kato* suggested might be appropriate.  549 U.S. 384, 393–94 (explaining that "[i]f a plaintiff files . . . [a] claim related to rulings that will likely be made in a pending or anticipated criminal trial[ ], it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended").  The criminal charges brought against Plaintiff in the District of Columbia revolve around his alleged possession of a high-capacity firearm magazine.  *See* Complaint, *U.S. v. Robinson*, Case No. 2020 CF2 005181 (D.C. Sup. Ct. June 4, 2020).  It is difficult to envision how the resolution here of Plaintiff's Eighth, Ninth, Tenth, and Fourteenth Amendment claims would "relate[ ] to rulings that will likely be made in" a criminal case concerning the possession of a firearm magazine.  Plaintiff's First, Second, Fourth, and Fifth Amendment claims are a bit different, as they implicate issues that may very well be litigated in the criminal matter.  However, in resolving Plaintiff's *Bivens* claims, the Court merely finds that Plaintiff is not entitled to civil relief under *Bivens* for those alleged constitutional violations and does not take a position on whether the search of Plaintiff's vehicle and the seizure of certain items therein violated the Fourth or the Fifth Amendments or whether the prosecution itself violates the First or Second Amendments.

A.        **The Facially Invalid Constitutional Claims**

Plaintiff's Eighth, Ninth, Tenth, and Fourteenth Amendment claims all fail.

At this juncture, Plaintiff cannot assert a claim under the Eighth Amendment, which "applies only to individuals who are being punished, and thus does not protect those against whom the government has not 'secured a formal adjudication of guilt in accordance with due process of law.'"  *Robertson v. District of Columbia*, No. 09–cv–1188, 2010 WL 3238996, at *3 (D.D.C. Aug. 16, 2010) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  Plaintiff's Eighth Amendment claim appears to arise from conduct that occurred during his arrest—not after "a formal adjudication of guilt."  *See* ECF No. 23 at 4 (alleging that Plaintiff's Eighth Amendment claim arises from his handcuffing during arrest).  So, no Eighth Amendment claim is cognizable on these facts.

Further, any Ninth Amendment claim Plaintiff asserts fails because that amendment "is a rule of construction, not a substantive basis for a civil rights claim."  *Rynn v. Jaffe*, 457 F. Supp. 2d 22, 26 (D.D.C. 2006); *see also McDonald v. City of Chicago*, 561 U.S. 742, 851 n.20 (2010) (Thomas, J., concurring in the judgment) (noting that the Ninth and Tenth Amendments are "obvious examples" of constitutional provisions that "are not readily construed as protecting rights that belong to individuals"); *Marshall v. Reno*, 915 F. Supp. 426, 428 (D.D.C. 1996) (rejecting the plaintiff's Ninth Amendment *Bivens* claim because "the Ninth Amendment does not set forth any particular guarantees, but is merely a rule of construction").  Plaintiff simply cannot "independently assert a cause of action under the Ninth Amendment."  *Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 30 (D.D.C. 1998).

Likewise, Plaintiff fails to state a Tenth Amendment claim.  Numerous courts have maintained that individuals have no right of action under the Tenth Amendment, which provides

14

that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X; *Rivera v. Fed. Bureau of Investigation*, No. 5:16-CV-00997, 2016 WL 6081435, at *3 n.4 (N.D.N.Y. Sept. 13, 2016) ("There is no private right of action under the Tenth Amendment."), *report and recommendation adopted*, 2016 WL 6072392 (N.D.N.Y. Oct. 17, 2016); *Holland v. Azevedo*, No. 14-CV-01349, 2016 WL 1754446, at *6 (N.D. Cal. May 3, 2016) ("The Tenth Amendment 'creates no constitutional rights cognizable in civil rights cause of action.'" (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 749 (9th Cir. 1986)); *see also McDonald*, 561 U.S. at 851 n.20 (Thomas, J., concurring in the judgment). However, the Supreme Court held in *Bond v. United States* that individuals, "in a proper case," can "challenge a law as enacted in contravention of constitutional principles of federalism" reflected in the Tenth Amendment. 564 U.S. 211, 223–24 (2011). Thus, any claim under the Tenth Amendment must flow from an "injury [that] results from disregard of the federal structure of our Government." *Id.* at 225–26; *see also United States v. Johnson*, 114 F.3d 476, 480 (4th Cir. 1997) (noting that the Tenth Amendment requires a showing that a federal statute or regulation is beyond Congress' power or that the "means of regulation employed . . . impermissibly infringes upon state sovereignty"). Here, however, Plaintiff's Tenth Amendment claim is based solely on his assertions that, when he was arrested, "[m]any of the officers did not have proper face coverings" and "didn't Follow The Mask mandates." ECF No. 4 at 1; ECF No. 23 at 5. Nowhere has Plaintiff "contended that any governmental action taken exceeds the limits of federalism," at least with respect to his Tenth Amendment claim. *Louis v. Seaboard Marine Ltd., Inc.*, No. 10-22719-CIV, 2012 WL 13071837, at *3 (S.D. Fla. Jan. 27, 2012) (dismissing plaintiff's Tenth Amendment claim for failure to allege conduct in contravention of federalism), *report and recommendation adopted*,

2012 WL 13071863 (S.D. Fla. Feb. 27, 2012).   Absent such allegations, Plaintiff's Tenth Amendment claim cannot stand.

With reference to the Fourteenth Amendment, Plaintiff baldly alleges that his arrest for possession of a "high-capacity magazine, 10mm bullet and a pair of brass knuckles . . . violated the . . . 14th Amendment."  ECF No. 4 at 3.  Whatever its merits, no Fourteenth Amendment claim can be brought here.  The Defendants are federal officers and, as they note, the Fourteenth Amendment applies to action by the states, not the federal government or its agents.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ([T]he Fourteenth Amendment applies only to the states.");  *see also* ECF No. 4 at 3 (referring to the officers who arrested Plaintiff as "federal agents"); ECF No. 23 at 4 (same).  Accordingly, Defendant has failed to state a plausible Fourteenth Amendment claim, and that claim is dismissed.  *See, e.g.*, *Webb v. Smith*, No. CIV-15-213, 2016 WL 7666119, at *1 (D. Utah Jan. 22, 2016) (dismissing plaintiff's Fourteenth Amendment claim against federal agents because "the Fourteenth Amendment of the United States Constitution does not apply to federal officers"), *aff'd*, 656 F. App'x 414 (10th Cir. 2016); *Russo v. Glasser*, 279 F. Supp. 2d 136, 142 (D. Conn. 2003) (similar); *Jones v. Dist. of Columbia*, 424 F. Supp. 110, 111 (D.D.C. 1977) ("[S]ince the fourteenth amendment was designed to apply only to states and not to territories such as the District of Columbia, Congress lacked the power under the fourteenth amendment to create a cause of action against federal officers.").

With Plaintiff's Eight, Ninth, Tenth, and Fourteenth Amendment claims off the table, all that is left to address are his official and individual capacity claims under the First, Second, Fourth, and Fifth Amendments.  The Court will assess the official capacity claims first, and then move to the individual capacity (or *Bivens*) claims.

16

### B.       Official Capacity Claims

As explained, the Court construes the Amended Complaint as bringing *Bivens* claims against the Defendants in their official capacities. However, "*Bivens* claims against federal officers in their official capacities are barred by sovereign immunity." *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 157 (D.D.C. 2007). Thus, the Court lacks subject matter jurisdiction over Plaintiff's claims against the Defendants in their official capacities.

A suit against federal agents in their official capacity is, in sum and substance, a claim against the federal government. *See Graham*, 473 U.S. at 166. But the United States "may not be sued except to the extent it consents to be sued." *Rudder v. United States*, No. CIV.A. 85-1969, 1987 WL 19232, at *2 (D.D.C. Oct. 20, 1987). And the federal government "has not consented to suit for alleged constitutional violations by its officials." *Applewhite v. D.C. Dist. Att'ys Off.*, No. CIV.A. 09-2439, 2009 WL 5173514, at *1 (D.D.C. Dec. 30, 2009). Plaintiff makes no argument to the contrary, even though it was his "burden of demonstrating waiver [of sovereign immunity] for each claim that" he brought. *Griffin v. United States*, No. 19-CV-762, 2019 WL 4644022, at *2 (D.D.C. Sept. 24, 2019), *appeal dismissed*, No. 19-5323, 2020 WL 2565349 (D.C. Cir. Mar. 4, 2020). The Court accordingly lacks subject matter jurisdiction over Plaintiff's official capacity claims, and dismisses those claims. *See id.* ("If plaintiffs fail to identify a statute expressly waiving immunity, the Court lacks subject matter jurisdiction to adjudicate a claim against the United States."); *Driever v. United States*, No. CV 19-1807, 2020 WL 6135036, at *6 (D.D.C. Oct. 19, 2020) (dismissing claims against federal officials because plaintiff "has not identified any consent to suit for monetary damages for the constitutional violations alleged here"); *Sutz v. Powers*, No. 1:20-CV-01096, 2020 WL 2112057, at *1 (D.D.C. Apr. 30, 2020) (dismissing claims against federal officials because "plaintiff has neither pled nor established that

the government has expressly consented to damages suits against its officials for constitutional violations thereby waiving *sovereign immunity*").

### C.    Individual Capacity Claims

Plaintiff's claims against Defendants in their individual capacities fare no better, as they seek to expand *Bivens* remedies far beyond the narrow limits the Supreme Court has established. Yet even if *Bivens* should be extended to include the claims Plaintiff asserts, the Defendants are nevertheless entitled to qualified immunity. Accordingly, the individual capacity claims must be dismissed, too.

#### 1.    A *Bivens* Remedy Should Not be Extended to Plaintiff's Claims

*Bivens* claims are highly circumscribed and, currently, are cognizable only in three, narrow factual contexts. The context of *Bivens* itself was a "claim against FBI agents for handcuffing a man in his own home without a warrant." *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1860. In *Davis*, the context was a "a claim against a Congressman for firing his female secretary." *Id.* And *Carlson* presented a "claim against prison officials for failure to treat an inmate's asthma." *Id.* "Significantly, the Supreme Court has never extended its holdings in [*Bivens*, *Davis* and *Carlson*] beyond their context." *Mejia-Mejia v. U.S. Immigration and Customs Enforcement*, No. 18-1445, 2019 WL 4707150 at *4 (D.D.C. Sept. 26, 2019).

A two-part inquiry governs any entreaty to extend *Bivens*, which Plaintiff seeks here. Courts first must determine "whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez*, __ U.S. at __, 140 S. Ct. at 743 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). The Supreme Court's conception of a "new context" is "broad," encompassing any context "different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* (quoting *Abbasi*, 582 U.S. at __, 137 S. Ct. at

18

1859).  In assessing whether a "new context" is presented, courts should consider, among other things, "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1860.  A "modest extension" of *Bivens* is an extension nonetheless.  *Id.* at __, 137 S. Ct. at 1864.

If a "new context" is presented, courts must then "ask whether there are any 'special factors [that] counse[l] hesitation' about granting the extension."  *Hernandez*, __ U.S. at __, 140 S. Ct. at 743 (alterations in original) (some internal quotation marks omitted) (quoting *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1857).  The Supreme Court's guidance on the "special factors" to consider has oftentimes been less than helpful, even tautological.  *See, e.g.*, *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1858 ("Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering [whether *Bivens* should be expanded] in the affirmative.").  However, this much is clear:  at the core of the "special factors" inquiry are "separation-of-powers principles."  *Id*. at 1857.  So, courts should query whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Id.* at 1857–58.

One such "special factor" that cuts against the recognition of a *Bivens* remedy is the existence of "an alternate remedial scheme."  *Pinson v. U.S. Dep't of Just.*, 514 F. Supp. 3d 232, 243 (D.D.C. 2021); *see also Abbasi*, 582 U.S. at __, 137 S. Ct. at 1858 ([I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer

a new *Bivens* cause of action."); *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (explaining that a "factor counseling hesitation" is the existence of an "alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages").  A related "special factor" is Congressional "activity in the field" in which the plaintiff's claim arises.  *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (finding that "Congress' activity in the field" is a special factor making it inappropriate to extend *Bivens*).  Another is national security concerns.  *See Black Lives Matter D.C. v. Trump*, __ F. Supp. 3d at __, __, 2021 WL 2530722, at *6 (D.D.C. 2021) (noting that "the Supreme Court has repeatedly recognized that national security concerns are a weighty special factor in the *Bivens* analysis"); *see also Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) ("The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence.").  Finally, as the ultimate aim of *Bivens* is to "deter[ ] individual officers from engaging in unconstitutional wrongdoing," any extension of *Bivens* that does not comport with that goal should be rejected. *Malesko*, 534 U.S. at 74.

Notably, simply because a litigant claims a violation of the same constitutional right for which a *Bivens* remedy is recognized does not necessarily mean the claim arises in the same "context."  *See Hernandez*, __ U.S. at __, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."); *see also Cantú v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019) ("Courts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" (quoting *FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994))).  In *Malesko*, for example, plaintiff asserted an Eighth Amendment cruel and unusual punishment *Bivens* claim against the corporate owner of a private halfway house that was

contracted by the federal Bureau of Prisons.  *See* 534 U.S. at 64.  In that case, halfway house employees allegedly denied plaintiff's request to use an elevator to reach his room, despite plaintiff's cardiac ailments.  *See id.*  Plaintiff later suffered a heart attack climbing the facility's stairs and was injured.  *See id*.  Twenty years earlier, in *Carlson*, the Court had recognized a *Bivens* remedy for Eighth Amendment cruel and unusual punishment claims in what appeared to be a similar "context."  In *Carlson*, as in *Malesko*, the plaintiff was harmed when prison officials failed to provide him with adequate medical care.  *See* 446 U.S. at 16 & n.1.  Yet the *Malesko* Court found that recognizing a *Bivens* remedy against a private entity "would not advance *Bivens*' core purpose of deterring individual officers from engaging in unconstitutional wrongdoing."  534 U.S. at 74.  Thus, "[e]ven though the right and the mechanism of injury were the same [in *Malesko*] as they were in *Carlson*," consideration of "special factors" made an extension of *Bivens* inappropriate.  *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1859; *see also Cantú*, 933 F.3d at 422 ("What if a plaintiff asserts a violation of the same clause of the same amendment *in the same way*? That still doesn't cut it.").

Applying these principles to Plaintiff's claims makes clear that no *Bivens* remedy should be recognized on these facts.

### a.    *Plaintiff's* Bivens *Claims Arise in New Contexts*

#### i.    First Amendment

Plaintiff's First Amendment claims are twofold.  He asserts that, in arresting him as he was "protesting the riots in support of local law enforcement," the Defendants infringed his right to assemble peaceably.  ECF No. 4 at 3.  Plaintiff also says that the arrest violated the First Amendment's guarantee of a free press because he was "working as a freelance photo journalist" when he was detained.  *Id.* at 2–3.  "[T]he constitutional right at issue" is a factor in determining

whether a *Bivens* claim arises in a new context.  *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1860.  Thus, these claims assuredly place *Bivens* in a "new context" because the Supreme Court has "never held that *Bivens* extends to First Amendment claims."  *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *see also Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *5 ("The plaintiffs' First Amendment claim arises in a new context because the Supreme Court has never extended *Bivens* to a claim brought under the First Amendment.").

### ii.     Second Amendment

Plaintiff alleges that Defendants also violated his Second Amendment right to bear arms when they arrested him for possession of the high-capacity magazine, 10mm bullet, and brass knuckles.[11]  *See* ECF No. 4 at 2.  This claim, too, arises in a new context, as the Supreme Court has never sanctioned a *Bivens* remedy for Second Amendment violations.  *See Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 223 (D. Conn. 2014) ("*Bivens* liability has not been extended to violations of the Second Amendment."); *see also Meeks v. Larsen*, 611 F. App'x 277, 286 (6th Cir. 2015) (affirming the district court's refusal to extend *Bivens* to the plaintiffs' claims under the Second Amendment).

### iii.     Fourth Amendment

Despite being of the same general nature as the claims at issue in *Bivens*, Plaintiff's Fourth Amendment claims also arise in a new context.  Plaintiff says Defendants violated his Fourth Amendment rights in two distinct ways.  *First*, Plaintiff avers that Defendants unlawfully searched his vehicle and seized his personal electronics, including his phones, tablet, and camera.  *See* ECF

---

[11] Plaintiff also asserts a Fifth Amendment right to "travel with a self-defense tool" that he says was infringed when he was arrested for possession of the high capacity magazine, the 10mm bullet, and brass knuckles.  *See* ECF No. 4 at 2 (asserting that "every American has the right to travel with the protection of a tool or device made for defense if bought legally").  The Constitution does not expressly enumerate such a right.  Liberally read, however, Plaintiff's claim sounds in the Second Amendment's right to bear arms, and so the Court will construe Plaintiff's Fifth Amendment claim as an allegation that his Second Amendment rights were violated.

No. 4 at 2.  *Second*, Plaintiff argues the officers used excessive force when they handcuffed him behind his body, allegedly exacerbating a preexisting injury.  *See id.* at 3.

Again, the inquiry here is not simply whether "the right and the mechanism of injury [are] the same" as in *Bivens*—that is, a Fourth Amendment claim arising from an allegedly unlawful search and seizure—but whether the facts plead by Plaintiff place his claim in a "meaningful[ly]" different context than was present in *Bivens*.  *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1859.  They do. *Bivens* featured federal narcotics officers entering and searching a private residence, which is "markedly different" from searching a private vehicle on a public street in the vicinity of the White House.  *Cf. Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *5 (concluding that the context of *Bivens* was "markedly different" from "government officers' response to a large protest in Lafayette Square outside the White House").  Thus, courts have found that Fourth Amendment claims involving vehicle searches bring *Bivens* into a new context.  *See, e.g.*, *Smith v. Clark*, No. 5:19-CV-00675, 2020 WL 5820534, at *3–*4 (W.D. Tex. Sept. 29, 2020) (concluding that *Bivens* claims arose in a new context where the plaintiffs' allegedly "consented to a search of their car for weapons and [the defendant] exceeded the scope of that consent when she searched the [plaintiffs'] cell phones without a warrant"); *Evans v. U.S. Border Patrol Agents*, No. 7:19-CV-00358, 2020 WL 9066054, at *8 (S.D. Tex. July 20, 2020) (finding that the plaintiff's excessive force *Bivens* claim arose in a new context because "the actions at issue in *Bivens* were predicated on allegations of a warrantless search and seizure occurring at a residence, unlike the vehicle stop  initiated"  in  the  present  case), *report and recommendation adopted sub nom. Evans v. Castillo*, No. CV M-19-358, 2021 WL 1215843 (S.D. Tex. Mar. 31, 2021); *Rivera v. Samilo*, 370 F. Supp. 3d 362, 368–69 (E.D.N.Y. 2019) (finding that the plaintiff's excessive force claim that "arose from a lawful vehicle search" placed *Bivens* in new context).

As to Plaintiff's claim of excessive force, they appear similar to the circumstances in *Bivens*, where the plaintiff also alleged "that unreasonable force was employed in making the arrest." *Bivens*, 403 U.S. at 389.  Yet "this similarity is not enough." *Evans*, 2020 WL 9066054, at *7.  The Supreme Court has a broad conception of "new context," and courts have distinguished excessive force claims arising from facts quite similar to those in *Bivens*.  Take *Rivera*, for example.  In that case, similar to here, federal law enforcement officers took the plaintiff into custody after stopping his vehicle, a search of which revealed contraband.  370 F. Supp. 3d at 365. Just as in this case, the officers restrained the plaintiff with handcuffs, which plaintiff complained "were too tight and aggravating" a preexisting injury.  *Id.*  The plaintiff in *Rivera* asserted, just as the *Bivens* plaintiff did, that the officers' excessive use of force violated his Fourth Amendment rights.  *Id.* at 365–66.  The court nonetheless ruled that the *Bivens* claim arose in a new context, because whereas the claim in *Bivens* centered around an alleged violation of privacy rights through a warrantless home invasion and the unreasonable search and seizure of property, Rivera's "claim arises from the force allegedly applied in making a lawful street arrest." *Id.* at 369.  So, too, here: unlike *Bivens*, Plaintiff's harm stems from an arrest outside the home based on Plaintiff's possession of illegal weapons.  This is sufficient to distinguish this case from *Bivens*.  Accordingly, both Plaintiff's Fourth Amendment claims bring *Bivens* into a new context.

iv.    Fifth Amendment

Plaintiff's remaining Fifth Amendment claim[12]—that Defendants' seizure of his electronics (phones, tablet, and camera) violated his Fifth Amendment due process rights—is meaningfully different from the due process claims at issue in *Davis* and therefore constitutes a new context.  *See* ECF No. 4 at 2 (alleging that the agents "took my cell phones, I-pad, and camera

---

[12] As explained in note 11 *supra*, Plaintiff's other Fifth Amendment claim was based on an alleged violation of the right "to travel with a self-defense tool."  The Court construed that claim to allege a Second Amendment violation.

(4th and 5th Amendment violation – illegal seizure)").  Although Plaintiff does not specify whether this Fifth Amendment claim is procedural or substantive in nature, the distinction is ultimately of no moment because it is in all respects meaningfully different from *Davis*.  That case featured gender discrimination claims against a Congressman; specifically, that he fired his secretary on account of her gender in violation of the "equal protection component of the Due Process Clause." *See* 442 U.S. at 230–31, 235.  That context is a world away from the Plaintiff's allegations, which assert a taking of his electronic devices.  Further, the Supreme Court has never extended *Bivens* to invasions of property rights under the Fifth Amendment.  *See, e.g.*, *Wilkie*, 551 U.S. at 541; *Cantú*, 933 F.3d at 422 ("No one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action.").  The Court therefore finds that Plaintiff's Fifth Amendment claim arises in a new context.  *Cf. Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *5 (finding that "government officers' response to a large protest in Lafayette Square outside the White House" was "'meaningfully different' from the context of sex-based employment discrimination at issue in *Davis*").

*     *     *     *     *

Thus, each of Plaintiff's *Bivens* claims arise in new contexts.  For the First and Second Amendment claims, this is primarily because no *Bivens* cause of action has ever been recognized for alleged violations of the rights guaranteed by those amendments.  On the other hand, while the Supreme Court has recognized *Bivens* claims for Fourth and Fifth Amendment violations, the violations of those amendments alleged here are meaningfully different from the contexts of *Bivens* and *Davis*, respectively.  Further, *all* these claims arise in a "new context" for another reason:  all seek to extend *Bivens* to a novel class of defendants—Secret Service agents.  Courts have

consistently refused to extend *Bivens* to new contexts where the claim "involve[s] different conduct by different officers from a different agency." *Cantú*, 933 F.3d at 423; *see also Malesko*, 534 U.S. at 68 ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants."); *Drewniak v. U.S. Customs & Border Protection, et al.*, No. CV 20-CV-852, 2021 WL 1318028, at *7 (D.N.H. Apr. 8, 2021) (finding that plaintiff's *Bivens* claims arose in new context because he sought damages from Border Patrol agents, whereas *Bivens*, *Davis*, and *Carlson* sought remedies from FBI agents, a Congressman, and Bureau of Prisons officials, respectively). The analysis now turns to whether "special factors" cut against the creation of *Bivens* remedies in these new contexts.

> b.   *Special Factors Weigh Against Extending Bivens To Plaintiff's Claims*

The Supreme Court has explained that separation-of-powers concerns lie at the heart of the "special factors" inquiry. *See Hernandez*, __ U.S. at __, 140 S. Ct. at 743. Extending a *Bivens* remedy to Plaintiff in this case would not only encroach upon Congress' legislative authority and its regulation of the Secret Service, but also has the potential to impede the Executive Branch's protection of the President and compromise the security of the area surrounding the White House. "[T]he costs and benefits of allowing a damages action to proceed" in cases like the one here are for the other branches—not this Court—to "consider and weigh." *Abbasi*, 582 U.S. at __, 137 S. Ct. 1858. For these reasons—and as further explained below—the Court declines to expand *Bivens* to encompass Plaintiff's claims.

*First*, extending *Bivens* to each of Plaintiff's constitutional claims would implicate serious national security concerns and impair the Executive Branch's ability to properly respond to security risks around its nerve center, the White House. As the D.C. Circuit has recognized, "the White House area is . . . a unique situs for considerations of presidential and national security,"

and "the need for effective security in the vicinity of the White House is great." *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1533 (D.C. Cir. 1984). The Secret Service has, along with other law enforcement agencies, provided that security for over 125 years. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 211 n.1 (D.C. Cir. 2013) (noting that "[t]he Secret Service began protecting presidents part-time in 1894"); *Friedman v. U.S. Secret Serv.*, 923 F. Supp. 2d 262, 282 (D.D.C. 2013) ("[The Secret Service] is responsible for the protection of various individuals, including the President and Vice President of the United States." (internal quotation marks omitted)). Our collective national interest in the work that the Secret Service does in maintaining the security of the President and the White House campus simply cannot be gainsaid. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam) (noting the nation's "overwhelming[ ] interest in protecting the safety of its Chief Executive"); *see also Rubin v. United States*, 525 U.S. 990, 990–91 (1998) (Breyer, J., dissenting from denial of certiorari) ("The physical security of the President of the United States has a special legal role to play in our constitutional system.").

Here, Plaintiff was arrested for possession of illegal weapons at his vehicle that was parked "behind the White House" on Constitution Avenue, NW. ECF No. 4 at 1; *see also* ECF No. 1 at 4. While that location is perhaps not as close as the protestors in *Black Lives Matter D.C.* were to the President and the residence—they were directly across Pennsylvania Avenue in Lafayette Park—it is nevertheless within "the vicinity of the White House," where "the need for effective security . . . is great."[13] *White House Vigil for the ERA Comm.*, 746 F.2d at 1533; *see also A*

---

[13] Of course, this is not to say that checks on the conduct of law enforcement, particularly in public forums, are unnecessary. They absolutely are. There is no better example of such a public forum than the areas around the White House, which have historically been open for First Amendment activity. However, the road to a *Bivens* remedy is a rocky one, and one which recognizes the Executive Branch's legitimate national security interests in safeguarding the White House. Further, as will be explained, individuals in Plaintiff's position are not wholly without a remedy for the conduct of law enforcement officers occurring in the vicinity of the White House. *See infra* n.18.

*Quaker Action Grp. v. Morton*, 516 F.2d 717, 729 (D.C. Cir. 1975) (noting "the uniqueness and importance of the security interest of protection of the White House"); *Quaker Action Grp. v. Hickel*, 429 F.2d 185, 187 (D.C. Cir. 1970) (noting "the critical area of providing security in the vicinity of the White House"). Indeed, courts in this Circuit have recognized that security concerns can be implicated by persons in the precise area where Plaintiff was arrested. In *Washington Mobilization Committee v. Cullinane*, the D.C. Circuit noted that police were "fearful that [demonstrators] intended mischief at the White House," and so they "established a line on the north side of Constitution Avenue" to prevent the demonstrators, who had congregated at the corner of 15th Street, NW and Constitution Avenue, NW, from "crossing onto the Ellipse, adjacent to the grounds of the White House." 566 F.2d 107, 113 (D.C. Cir. 1977). This is precisely the area in which Plaintiff was detained.

As Judge Friedrich explained in *Black Lives Matter D.C.*, the question here is "not whether the national security risk actually justified the particular action taken" against the plaintiff. __ F. Supp. 3d at __, 2021 WL 2530722, at *6 (citing *Hernandez*, __ U.S. at __; 140 S. Ct. at 746). Instead, the inquiry focuses on "whether 'national-security concerns' were present in the decision-making process the federal officials faced." *Id.* (citing *Hernandez*, __ U.S. at __; 140 S. Ct. at 746). Given the proximity of Plaintiff and his vehicle to the White House and the intensity of the demonstrations that had occurred in Washington in early July 2020, it seems highly likely that security of the White House complex—and by implication national security concerns—was a factor in the Secret Service's decision to investigate Plaintiff's vehicle and later arrest him.[14]

---

[14] Though not a factor in the Court's analysis, it is also worth remembering that, on June 4, 2020—the day before Plaintiff was arrested—a series of metal barriers were erected along Constitution Avenue N.W. in response to the civil unrest occurring in the District of Columbia. *See* Betsy Klein, "White House fortifies security perimeter ahead of continued protests", *CNN* (June 4, 2020) (noting that "the fencing extended down 17th Street from Pennsylvania Avenue to Constitution Avenue"), *available at* https://www.cnn.com/2020/06/04/politics/white-house-fence-barricade/index.html. The area in which Plaintiff was arrested is directly outside those barriers.

Nor does the fact that Plaintiff challenges the conduct of individual officers—rather than a Secret Service or broader government policy—weigh in favor of extending *Bivens* here.  To be sure, *Abbasi* characterized the "national security" special factor as one focusing on national security "policy," not the "standard law enforcement operations" at issue in this case.  582 U.S. at __, 137 S. Ct. at 1860–61.  In accordance with that guidance, a court in the Eastern District of Pennsylvania found that a Secret Service agent could be subjected to a Fourth Amendment *Bivens* claim where, as here, the plaintiff "merely challeng[ed] the constitutionality of a one-off arrest" rather than "government policy."  *Graber v. Dales*, No. CV 18-3168, 2019 WL 4805241, at *4 (E.D. Pa. Sept. 30, 2019).  *Graber*, however, was decided before *Hernandez*, which "involved a challenge to one instance of a single line officer's conduct, yet the Supreme Court still found that national security was a special factor counseling against extension of the *Bivens* remedy."  *Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *6 (internal citations omitted).  If *Hernandez* means anything in this context, it is that "national security" concerns can be implicated even when government policy writ large is not at issue.

The Court also shares Defendants' concern about the potential impact of recognizing a *Bivens* claim in this context.  *See* ECF No. 21-1 at 21–22.  As Justice Ginsburg once explained, "[o]fficers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy."  *Reichle*, 566 U.S. at 671 (Ginsburg, J., concurring in judgment).  This is particularly true with respect to the Secret Service, which routinely places its agents between the Presidents and crowds.  The Court is troubled by the prospect that, when engaged in that vitally important work, individual agents' decisionmaking may become bogged down by considerations of future liability and damages.  That is certainly sufficient to "counse[l] hesitation" about extending the *Bivens* remedy here.  *Hernandez*, __ U.S. at __, 140

S. Ct. at 743 (alteration in original); *see Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to . . . national security are rarely proper subjects for judicial intervention."). Other courts have reached similar conclusions. *See, e.g.*, *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017) ("The threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers.  In light of Supreme Court precedent, past and very recent, that is surely a special factor that gives us pause" in the *Bivens* analysis.); *Brunson v. Nichols*, No. 1:14-CV-2467, 2018 WL 7286410, at *4 (W.D. La. Dec. 7, 2018) (declining to extend *Bivens* because "[o]fficials would be continuously faced with the threat of damages liability which would have the potential to thwart an official in making a split-second decision undermining the paramount need to protect inmates and staff"), *report and recommendation adopted*, 2019 WL 545479 (W.D. La. Feb. 11, 2019); *Boule v. Egbert*, No. C17-0106, 2018 WL 3993371, at *5 (W.D. Wash. Aug. 21, 2018) ("This Court agrees that the risk of personal liability [under *Bivens*] would cause Border Patrol agents to hesitate and second guess their daily decisions about whether and how to investigate suspicious activities near the border, paralyzing their important border-security mission.").

The Court is mindful that "national security" should not employed as a "talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'"  *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)).  In this case, though, the national security concerns are legitimate, even if they might not have "actually justified" Defendants' conduct.  *Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *6. Properly securing the vicinity around the White House is of paramount importance, and recognizing a *Bivens* claim stemming from an arrest of a person who allegedly possessed illegal weapons within that zone could seriously undermine that interest.  *Cf. Cmty. for Creative Non-*

*Violence v. Kerrigan*, 865 F.2d 382, 389 (D.C. Cir. 1989) (finding that regulations restricting the use of certain areas around the White House for First Amendment activities furthered the "significant" government interest in "preventing terrorists from using signs, packages, or other props to conceal weapons").  Thus, national security interests counsel against extending a *Bivens* remedy to Plaintiff's claims.

*Second*, Congress' failure to create a cause of action against Secret Service agents when carrying out their duties in the area surrounding the White House—despite the legislature's longstanding attention to the Secret Service—also gives the Court some pause in considering whether *Bivens* should be extended, particularly as to Plaintiff's First Amendment claims.  After an attempted assassination of President Truman in 1951, Congress "permanently authorized the Secret Service to protect the President and Vice President."  *Judicial Watch*, 726 F.3d at 211 (citing Pub. L. No. 82–79, § 4, 65 Stat. 121, 122 (1951) (codified at 18 U.S.C. § 3056(a))).  Over the decades, Congress has consistently tinkered with the Secret Service's mandate, and the Service's protection of the President and the White House have been the subject of multiple Congressional inquiries.  *See Timeline of Our History*, https://www.secretservice.gov/about/history/timeline (last visited Dec. 16, 2021).  Notably, Congress convened a Select Committee on Assassinations in 1976 to investigate the assassination of President Kennedy, and the Committee evaluated the conduct of individual Secret Service officers.  *See* H.R. Rep. No. 95-1828 at 235 (describing the response of individual Secret Service officers to the shooting of President Kennedy).  Importantly, that Committee "acknowledged the potential for conflict between the demands of presidential security and protesters' freedoms"— which is highly relevant to Plaintiff's First Amendment claims—and yet Congress still did not authorize "a damages remedy for federal officers' violations of protesters' rights."  *Black Lives*

*Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *7; *see also* H.R. Rep. No. 95-1828 at 464 (noting that "[t]he committee was acutely aware of the problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures"). Further, Congress has held hearings as recently as 2014 on White House security and the role of the Secret Service in safeguarding the grounds. *See White House Perimeter Breach: New Concerns About the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014), *available at* https://www.hsdl.org/?view&did=806336. Yet, despite the consistent legislative attention paid to the Secret Service over the course of 70 years, Congress has never made Secret Service agents liable for constitutional claims against them. The *Black Lives Matter D.C.* court concluded that such legislative inaction despite Congress' "extensive activity in the field" indicated that the "'failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than inadvertent.'" *Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *7 (quoting *Abbasi*, 582 U.S. __, 137 S. Ct. at 1862). Indeed, Justice Kennedy made clear in *Abbasi* that "the silence of Congress is relevant" in determining whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1858, 1862. So it is here, where Congress has long considered the competing interests of Presidential security and First Amendment interests in the area around the White House. "[G]iven the many years Congress has had 'to extend the kind of remedies' sought by" Plaintiff, *Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *7 (quoting *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1862), the lack of a statutory remedy against Secret Service officers counsels against the judicial creation of a *Bivens* claim.[15]

---

[15] Of course, it is certainly possible that, as the *Graber* court suggested, "low-level misconduct" by Secret Service agents might have well "escape[d] congressional notice," and therefore nothing should be read into Congress' silence.

The Defendants also assert that the availability of alternative remedies, namely injunctive relief, cuts against recognizing a *Bivens* claim in these circumstances. The Court is not persuaded. As a general matter, it is true that "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1865. More, what matters is the *availability* of the alternative remedy, not whether it is equally as *effective* in redressing the plaintiff's harm as a *Bivens* claim. *See Kelley v. Fed. Bureau of Investigation*, 67 F. Supp. 3d 240, 270 (D.D.C. 2014) ("[I]t is not necessary for the alternative statutory scheme to provide the exact same remedies that would be available in a *Bivens* action."); *see also Minneci v. Pollard*, 565 U.S. 118, 129 (2012) (observing that alternative remedies "need not be perfectly congruent" to preclude a *Bivens* remedy); *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability."); *Wilson v. Libby*, 535 F.3d 697, 706, 709 (D.C. Cir. 2008) (concluding that an alternative remedies can cut against extending *Bivens* even if that alternative process affords no remedy).

In this case, Plaintiff requested preliminary injunctive relief when he amended his claims. *See* ECF No. 4 at 4–5. The Court dismissed those claims early in the litigation. *See* ECF No. 6 at 2–3. However, the Court is not convinced that Plaintiff ever had a colorable claim for injunctive relief. Injunctions are intended to "deter future wrongful acts," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), and so courts must determine "whether there is a real and immediate threat of repeated injury." *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 8–9 (D.C. Cir. 1988). Past harm, while relevant, is not dispositive in the analysis. Here, Plaintiff never clearly articulated a fear of future harm, and the Court can discern none based on the limited

---

2019 WL 4805241, at *5. On the other hand, though, the Select Committee on Assassinations did consider the conduct of individual Secret Service officers. *See* H.R. Rep. No. 95-1828 at 235.

information before it.  Indeed, Plaintiff's claims revolve around what *was* done to him, not what would *continue* being done to him.  So, it is unclear whether Plaintiff had even a colorable claim for injunctive relief available to him, and the Court is therefore unwilling to count the remote possibility of an equitable remedy against Plaintiff in the *Bivens* analysis.  *Cf. Black Lives Matter D.C.*, __ F. Supp. 3d at __, 2021 WL 2530722, at *7, *11 (finding that the plaintiffs had standing to pursue injunctive relief claims for alleged infringement of First Amendment activity in Lafayette Square (adjacent to the White House), and therefore injunctive relief was an alternative remedy that weighed against extending *Bivens*).  The Court is keenly aware that alternative remedies need not be successful in order counsel against the extension of a *Bivens* remedy.  *See id.*, at *7 (finding that equitable relief claims are legitimate alternative remedies even "[t]hough these alternative avenues may ultimately prove unsuccessful").  But as the Defendants' concede, such alternatives must, at the very least, provide the plaintiff with some "'means to be heard' on his position" (ECF No. 21-1 at 21 (citing *Wilkie*, 551 U.S. at 552)), and it is simply not clear that seeking equitable relief was a credible alternative for Plaintiff.  In any event, even assuming that Plaintiff lacked a colorable basis for injunctive relief in this case, that alone does not demand the availability of a *Bivens* remedy.  *See Malesko*, 534 U.S. at 69 (noting that the Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court").[16]

---

[16] The Federal Tort Claims Act ("FTCA") may also provide alternative redress for some of Plaintiff's harm (*see infra* n.18) thereby militating against recognizing a *Bivens* remedy, but because the parties have not briefed the issue, and it is a subject of some disagreement within the lower courts, the Court declines to address it.  In *Abbasi*, the Court observed that "any alternative, existing process for protecting the [injured party's] interest" could be a "convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  582 U.S. at __, 137 S. Ct. at 1858 (alteration in original) (quoting *Wilkie,* 551 U.S. at 550).  Some courts have interpreted this remark to mean that the availability of FTCA relief undermines any argument to extend *Bivens*.  *See, e.g.*, *Annappareddy v. Lating*, No. 1:18-CV-03012, 2019 WL 12094026, at *10 (D. Md. Oct. 18, 2019) (noting that, "after *Abbasi*, an FTCA claim can be considered a special factor weighing against permitting the extension of *Bivens*"), *aff'd in part, rev'd in part on other grounds and remanded sub nom.*, No. 19-2285, 2021 WL 1603987 (4th Cir. Apr. 26, 2021); *Johnson v. Roberts*, C/A No. 3:17-3017, 2018 WL 6363921, at *5 (D.S.C. Oct. 17, 2018) (finding *Bivens* claim

\*      \*      \*      \*      \*

As in *Hernandez*, "this case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers." __ U.S. at __, 140 S. Ct. at 749.  To recognize a *Bivens* remedy in this case would, first and foremost, undercut the ability of the Executive Branch and its agents to effectively secure the physical space around the White House.  This would implicate serious national security concerns that the Supreme Court has said figure prominently in the "special factors" analysis.  *See id*. at 745–46; *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1861.  Expanding *Bivens* here would also offend the separation of powers between the Judiciary and Congress by implying rights of action the legislature has not seen fit to create.  Congress' silence is salient here given that the Secret Service and the general security of the President and White House area have repeatedly been the subject of hearings, investigations, and other legislation for decades—yet at no time has Congress authorized the sort of remedy Plaintiff seeks here.  In light of these special factors, Plaintiff's *Bivens* claims against Defendants in their individual capacities must be dismissed.

> 2.      Even if Plaintiff's *Bivens* Claims Were Cognizable, Defendants are Entitled to Qualified Immunity

Assuming that Plaintiff's *Bivens* claims against Defendants could move forward—and they cannot—they are nonetheless be barred by qualified immunity.  "Qualified immunity shields

---

precluded because the FTCA is a sufficient alternative remedy to "address claims against the United States for personal injuries caused by government employees acting within the scope of their employment"), *report and recommendation adopted*, 2018 WL 6344136 (D.S.C. Dec. 5, 2018).  Other courts have declined to construe *Abbasi* as foreclosing a *Bivens* claim when FTCA relief is available.  *See, e.g.*, *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 711 (S.D.N.Y. 2020) (reviewing pre-*Abbasi* Supreme Court case law indicating that the FTCA "does not preclude a *Bivens* remedy" and noting that "the Supreme Court has not specifically called into question its prior analysis regarding the FTCA's availability in *Bivens* actions"); *Lineberry v. United States*, C/A No. 5:17-CV-04124, 2018 WL 4224458 (S.D. W. Va. Sept. 5, 2018) (finding "that the FTCA and state tort law" were not appropriate alternative remedies for plaintiff's constitutional claims); *see also K.O. v. U.S. Immigration & Customs Enforcement*, 468 F. Supp. 3d 350, 367 n.3 (D.D.C. 2020) (maintaining post-*Abbasi* and *Hernandez,* that FTCA claims "are not an alternative of the sort that qualifies as a special factor in the *Bivens* analysis," but not addressing the "any alternative" language in *Abbasi*).

federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "[T]he dispositive question" in determining whether a right is "clearly established" is "'whether the violative nature of *particular* conduct is clearly established.'"   *Abbasi*, 582 U.S. at __, 137 S. Ct. at 1866 (quoting *Mullenix v. Luna*, 577 U.S. 7, 136 (2015) (*per curiam*)).   "Qualified immunity is properly evaluated at the motion to dismiss stage."   *K.O.*, 468 F. Supp. 3d at 368.

As explained, "[t]he first prong of the qualified immunity analysis is whether the plaintiff has shown the defendant violated a constitutional right."   *Jones*, 2019 WL 1301788, at *14.   As explained, nowhere in his filings does Plaintiff articulate any conduct committed by officers Pilgrim or Naples, specifically, that violated any of Plaintiff's constitutional rights.   Courts have found claims barred by qualified immunity on that basis.   *See, e.g.*, *Jones*, 2019 WL 1301788, at *11, *14 (finding the plaintiff's *Bivens* claims barred by qualified immunity where the plaintiff "failed to allege what defendants here did with respect to his First Amendment claim with any particularity" and "fail[ed] to allege any act by any particular defendant").   But even if Plaintiff had pleaded sufficient facts to support a plausible claim that his constitutional rights were violated, he nevertheless failed explain how or why those rights were "clearly established" as of the time of his arrest.   *See generally* ECF No. 4 and No. 23.   Even for *pro se* litigants, courts in this Circuit find failure to adequately allege whether the right at issue was "clearly established" at the time of the alleged injury dispositive in the qualified immunity analysis.   *See, e.g.*, *Bozgoz v. Blackwell*, No. CV 19-2790, 2021 WL 4243402, at *7 (D.D.C. Sept. 17, 2021) (finding a *pro se* litigants' claims barred by qualified immunity where they "fail[ed] to identify any clearly established

36

constitutional right"); *Driever*, 2020 WL 6135036, at *8 (finding a *pro se* litigant's claims barred by qualified immunity where, as here, the litigant "cite[d] no case law that suggests that the constitutional claims she presents arise from clearly established law").  Thus, even if Plaintiff could maintain *Bivens* claims against Defendants in their individual capacities, he still has not navigated the qualified immunity hurdle.  His claims must be dismissed for these reasons, as well.

## III.   CONCLUSION

The issue in this case is not whether law enforcement agents may roam free in the area around the White House, detain persons at will, and generally do whatever they please.  Of course that is not the case.[17]   Rather, the essential question is whether this Court should create a Constitutional remedy that Congress has failed to enact despite ample opportunity to do so.  To recognize a *Bivens* remedy in these circumstances would not only encroach upon Congress' authority, but also has the potential to impair the Executive Branch's ability to secure the area surrounding White House—with possible national security consequences.  Consistent with the Supreme Court's proviso that such judicial activity is "disfavored," the Court declines to extend a *Bivens* remedy to Plaintiff's claims.  And even if the Court took that extraordinary, "disfavored"

---

[17] The FTCA provides a check on the actions of law enforcement officials in and around the White House grounds. The FTCA "contains an express waiver" of sovereign immunity for "'acts or omissions of investigative or law enforcement officers of the United States Government'" arising out of any claim "'of assault [or] battery'" or false arrest, false imprisonment, and malicious prosecution, among others.  *Murphy v. United States*, 121 F. Supp. 2d 21, 24 (D.D.C. 2000) (quoting 28 U.S.C. § 2680(h)), *aff'd*, 64 F. App'x 250 (D.C. Cir. 2003).  An "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  This surely includes Secret Service agents.  *See, e.g.*, *Parker v. Blackerby*, 368 F. Supp. 3d 611, 618 (W.D.N.Y. 2019) (discussing applicability of FTCA to conduct of Secret Service agent); *Murphy*, 121 F. Supp. 2d at 24 (same).  Importantly, the law enforcement officer must have been "engaged in investigative or law enforcement activities" at the time the tortious conduct occurred in order to trigger the exception to sovereign immunity found in § 2680(h).  *Murphy*, 121 F. Supp. 2d at 25 (quoting *Employers Ins. of Wausau v. United States*, 815 F. Supp. 255 (N.D. Ill. 1993)).  Thus, for individuals in Plaintiff's position, the FTCA may very well afford a remedy that *Bivens* does not.

step and implied a *Bivens* remedy on these facts, Plaintiff has failed to explain why qualified immunity would not also bar his claims.

For the foregoing reasons, Defendants' motion to dismiss is granted, and the Amended Complaint is dismissed with prejudice.[18]  An Order to that effect accompanies this Memorandum Opinion.

Date:  December 17, 2021

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

[18] The Court finds that Plaintiff's *Bivens* claims are not cognizable as a matter of law, and therefore amendment would be futile.  Other federal courts have reached similar conclusions.  *See, e.g.*, *Johnson v. Cooke*, No. 15-21790-CIV, 2021 WL 2561794, at *9 (S.D. Fla. May 6, 2021) ("Because the Court has found that *Bivens* does not provide a remedy for Plaintiff's [constitutional] claims, any amendment would be futile and the Complaint should therefore be dismissed with prejudice." (emphasis omitted)), *appeal filed*, 21-12096 (11th Cir. 2021); *Negron v. United States*, 19-cv-05442, 2020 WL 5634304, at *10 (S.D.N.Y. Sept. 21, 2020) ("As to Plaintiff's *Bivens* claims, any amendment would . . . be futile.  Absent a Supreme Court decision creating a new *Bivens* remedy on all fours with Plaintiff's alleged *Bivens* Claims, Plaintiff's *Bivens* Claims cannot survive a motion to dismiss.  Accordingly, . . . the Court dismisses Plaintiff's . . . *Bivens* Claims with prejudice."); *see also Simpkins v. District of Columbia*, 108 F.3d 366, 370 (D.C. Cir. 1997) ("[T]o permit [the plaintiff] to file another suit containing the same worthless claims would be inconsistent with the duty of lower federal courts to stop insubstantial *Bivens* actions in their tracks and get rid of them.  Such lawsuits impose undue burdens on the officer being sued, and thus interfere with the operations of government." (internal citations omitted)).  Further, the Court notes that when Plaintiff was previously provided an opportunity to amend his claims, he failed to adhere to the Court's instructions to specify whether he was bringing his claims against the Defendants in their official and/or personal capacities.  This does not inspire confidence that permitting further amendment would be fruitful.  For all these reasons, Plaintiff's claims are dismissed with prejudice.